BOARD OF COMMISSIONERS OF FLOYD COUNTY *et al. v.*
MASSACHUSETTS BONDING AND INSURANCE
COMPANY.

No. 8640.   August 16, 1932.
Adhered to on rehearing September 26, 1932.

*Wright & Covington,* for plaintiffs in error.
*Jones, Evins, Powers & Jones* and *Ralph Williams,* contra.

BELL, J. (After stating the foregoing facts.)

The execution in the present case was issued by county commissioners against a county treasurer and his surety, and was issued not only for principal but also for interest at 20 per cent. per annum, and for attorney's fees. Under the decision in *Massachusetts Bonding Co.* v. *Board of Commissioners of Richmond County,* 172 *Ga.* 409 (157 S. E. 459), the execution must be construed as having been issued under section 585 of the Civil Code of 1910; and having been so issued, it could not be arrested by affidavit of illegality. The defendant surety company, therefore, was entitled to relief in equity, provided it showed a valid defense to the enforcement of the execution. *Webb* v. *Newsom,* 138 *Ga.* 342 (75 S. E. 106). The request of counsel for the plaintiff in error that the *Richmond County* case be reviewed and overruled is denied.

Did the petition set forth a valid defense against the claim of liability; and if so, did the court err in granting the interlocutory injunction, after hearing the evidence? Since the allegations of the petition were at least as strong for the plaintiff as the evidence which was later introduced, we will first discuss the question as related to the evidence. It appears from the evidence that the bank was insolvent on October 10, 1930, the date when the outgoing treasurer delivered to his successor the check for $36,217.28; and yet the bank was a going concern and continued to do business for a period of more than a month thereafter. The mere fact that the bank was insolvent on the date of the delivery and acceptance of this check, and of its deposit to the credit of the new treasurer, would not establish a violation of the bond of the old treasurer as for a failure to account to his successor in office. The question is, had the insolvency of the bank progressed so far that the bank could not have paid this check in cash upon its presentation in due course by the new treasurer. If the bank could and would have paid the check in whole, then there was no default by the old treasurer; but if the bank could and would have paid the check in part, but not in whole, there was a default to the extent of the difference. To that extent there was a loss of public funds by the insolvency of the bank, and for such loss the old treasurer and his surety were responsible to the county. After the allowance of certain credits, the execution is now proceeding for the principal sum of $10,527.54. Assuming that the evidence demanded the inference

that the bank could not and would not have paid the entire amount of the check in case the money had been called for, we think there was an issue of fact as to whether it could and would have paid such an amount as would have left a balance less than the principal sum now claimed in the execution. If so, the evidence shows at least a partial defense against the claim as now prosecuted by the county commissioners. The surety company is liable only for such a sum as would not have been paid on this check if the cash had been demanded by the new treasurer. In referring in this opinion to the question of whether the bank could and would have paid the check in part but not in whole, we are not to be understood as dealing with any question as to whether the new treasurer should have accepted a partial payment instead of allowing the check to be dishonored. We are simply discussing the question of default by the old treasurer, and declaring the rule by which such default should be determined, namely, by ascertaining the value of the check upon the basis of the amount of money that could and would have been paid upon the same in case of a demand for cash.

Our conclusions upon these questions are supported by principle and authority. In Preston School District v. Robinson, 81 Minn. 305 (84 N. W. 105, 83 Am. St. R. 374), the facts were as follows: Robinson was treasurer of the plaintiff school district. On August 6, 1898, while serving his first term, he was re-elected as his own successor, and made a bond on which the suit was later brought against himself and his sureties. In August, 1899, H. R. Wells was duly elected as Robinson's successor. Robinson failed to pay over to Wells the sum of $1367.68 belonging to the school district, and this was the claim in suit. The defendants contended that Robinson never in fact received the money in question, or its equivalent, and hence never became liable therefor. Robinson was the district treasurer, and the funds entrusted to his keeping came from the county treasurer. That official delivered to him as district treasurer, on July 21, 1898, a check for about $3000 on Fillmore County Bank, which check was intended to cover public moneys due from the county to the school district. Robinson accepted the check, presented the same to the bank for payment, and as school district treasurer received credit on the books of the bank for the full amount of the check. He subsequently checked out of the bank all of the money except the amount for which the action was brought.

It clearly appeared that at the time the check was delivered to Robinson by the county treasurer, the drawee bank was insolvent and unable to pay its debts. With respect to these facts and the contentions based thereon, the court said: "Appellants contend that the acceptance by Robinson of the county treasurer's check, and the transfer of the amount thereof to his credit on the books of the bank, did not amount to a receipt of the money by Robinson to any greater extent than the amount thereafter actually drawn out by him. And further, that, because of the fact that the bank was insolvent at the time, the county had lost its money therein, and none passed to Robinson by the check. This contention is not sound and can not be sustained. There is no evidence that the bank did not have funds on hand to meet the check the day it was delivered. It may have been insolvent—hopelessly so, and still have had ample funds on hand to meet this particular check. It appears to have been a 'going concern,' and was then, and continued for some time thereafter, doing its ordinary and usual banking business. Robinson's acceptance of the check, and obtaining credit for the amount thereof on the books of the bank, was equivalent to the delivery of the money to him. It was not necessary to actually draw the money out of the bank, and then redeposit it. . . Defendants further claim that the shortage in question occurred during Robinson's first term of office, and that these defendants, sureties upon the bond for the second term, are not liable therefor. . . The position of appellant is that at and before the commencement of Robinson's second term the bank was insolvent and unable to pay its debts, and could not and would not have paid Robinson the balance due him had he called for and demanded it; that at no time after the execution of this bond could the bank have paid Robinson such balance. . . If this contention can be sustained, the order appealed from should be reversed. If, as a matter of fact, the bank had no funds, and could not have paid Robinson at the time of the execution of the bond, or between that date and the time of closing its doors, Robinson's shortage in fact occurred during his first term of office, and these defendants are not liable.".

In School District v. Hubbard, 110 Iowa, 58 (81 N. W. 241, 80 Am. St. R. 271), the case involved the following facts: Hubbard as treasurer of a school district made a settlement with its board of directors in September, 1897, in which he produced a statement of

594

a bank that he had on deposit with it the sum of $18,000. The bank failed in March, 1898, with the result that the district sustained a loss on account of this deposit; and suit was then brought upon the bond of the treasurer, which was existing and of force at the date of the settlement. There was evidence that the money could and would have been produced had the board so demanded. The court stated that while the board of directors could not lawfully accept anything but money in the settlement, yet "if the certificates actually represented cash within the control of the treasurer, which could and would have been produced had the board of directors so demanded, they should be treated as money in a suit on the official bond. To hold otherwise would ignore business usages, and give undeserved importance to an irregularity which could not have affected the rights of any one concerned."

In Oeltjen v. Menard County, 160 Ill. 409 (43 N. E. 610), suit was brought upon the official bond of Oeltjen as county treasurer of Menard County, Illinois. The bond was executed on October 19, 1893. The public funds involved in the controversy had been received by the treasurer, and deposited in a bank, before the execution of this bond. The bank failed on November 15, 1893, and the evidence showed that the bank was hopelessly insolvent at the time the bond was executed, and that it was continuing to do business by disposing of its property and by other temporary makeshifts. After the failure of the bank, and as a consequence thereof, the treasurer failed to pay over certain moneys, as required by law. It was contended by the sureties that the treasurer's failure did not constitute an official delinquency occurring *after* the approval of the bond, for the reason that the money had been deposited in an insolvent bank before the bond was executed. The court held that there was no official delinquency until the bank ceased to do business and to honor such checks as were presented to it for payment, and thus overruled the contention of the defendants that the loss had occurred before the execution of the bond. While the Oeltjen case is not directly in point upon the question presented in the case at bar, it does illustrate the proposition that the surety here was liable only for such balance as may have existed after crediting the amount which the bank could and would have paid upon the check in the event the new treasurer had demanded cash thereon.

In Yawger v. American Surety Co., 212 N. Y. 292 (106 N. E.

64, L. R. A. 1915D, 481), the controversy arose upon a suit for contribution by one surety against another, which had respectively become sureties on the bonds of one Grisco for successive terms as treasurer of the town of Cicero in Illinois. The case involved a determination of when the breach or breaches occurred with respect to the two bonds. At the execution of the second bond, Grisco had on deposit in Lincoln Bank a large sum of money as treasurer, and the bank failed about eight months thereafter. In reality, it had been insolvent for a long time, and was insolvent at the time the second bond was executed. In an accounting between Grisco and his successor at the end of his second term, he was unable to pay over all funds to which the town was entitled, and by reason of this failure on his part the municipality recovered a judgment against the surety for the second term. This surety, after paying the judgment, brought suit against the surety for the first term, claiming that the loss sustained during the first term should be borne by the two sureties, upon the principle of equitable contribution. In that suit it was urged for the defendant that there had been no default on the first bond. It was insisted that Grisco fulfilled the condition of the bond when, acting as his own successor, he continued the account in Lincoln Bank during his second term, and that thereafter the sole liability, not only for later deposits, but also for those made during the first term, devolved upon the second surety. In an opinion written by Mr. Justice Cardoza, now a Justice of the Supreme Court of the United States, the court said: "We do not share that view. We think that to the extent of the loss suffered during the first term the defendant, as well as the second surety, was liable to the town, and that the second surety, having discharged a debt for which the defendant was equally bound, is entitled, through the remedy of contribution, to enforce an equitable division. Barnes v. Cushing, 168 N. Y. 542 [61 N. E. 902]. This must be so unless it can be said that Grisco has already satisfied the condition of the defendant's bond. We do not think he has. In our view he has neither accounted for the moneys that came into his hands during his first term, nor paid them over pursuant to law. He did not account for the money by innocently carrying forward a fictitious balance, any more than he would have accounted for it by carrying forward such a balance with guilty knowledge. It might as well be said that if he had put the money in a vault, and the

vault was robbed without his knowledge, he could have discharged his first surety by reporting to the second surety that the money was intact. Before the first term was ended, the money had been lost, and something more than mere words were needed to restore it. We do not mean to say that the plaintiff would establish a loss of the money during the first term by proof that the liabilities of the bank to all its depositors were in excess of its assets. That would not make out a present loss to this particular depositor. If the bank, though insolvent, was continuously engaged in business, responding to all demands, so that a check for the town's deposit would have been honored, the loss was not yet complete. But the allegations of the complaint show more than a deficit of aggregate assets as compared with aggregate liabilities. They show that . . the deficit had progressed so far that the balance due to the town could not have been paid."

In School District v. Hackman, 178 Minn. 199 (226 N. W. 514), it appeared that Daby as treasurer of a school district delivered to Hackman, his successor, a check upon a bank for the amount of money chargeable to him as such treasurer. Hackman took credit for the amount in the same bank, and, by reason of the failure of the bank about six weeks later, he was unable to account for a balance which remained in the bank at that time. An action was brought upon his bond. The court held that "Hackman received the money, though the bank did not have cash in its vault in a sufficient sum to pay the amount; it having money in correspondent banks and other credits out of which payment, if demanded, could have been made."

It is plain from the foregoing decisions that where an officer, as a public treasurer, in an accounting with the authorities to whom he is responsible, or with his successor in office, delivers checks, drafts, or certificates of deposit representing public funds which he has in bank, and the same are accepted in lieu of cash, and credit therefor is transferred by the bank to the authorities or the official to whom the accounting is made, the fact that the bank may be insolvent at the time of such transaction does not necessarily show a default by the officer making such accounting, but the transaction should in equity, as in the instant equity case, be treated as a transfer of money, to the extent of the amount which the bank could and would have paid in cash, if cash had been demanded. A

different conclusion was reached in Commissioners of Cedar County *v.* Jenal, 14 Neb. 254 (15 N. W. 369), but the decision in that case appears to have been based upon a local statute which made it unlawful for a county treasurer to deposit public funds in a bank; in other words, he was required by statute to keep the funds in specie. State *v.* Hill, 38 Neb. 698 (57 N. W. 548). There is no such rule in this State, and the treasurer was not guilty of a conversion or a breach of his bond by the mere act of depositing the money in a bank, although the law made him responsible absolutely for such loss as might be sustained by the insolvency of the institution. *Lamb* v. *Dart,* 108 *Ga.* 602 (6) (34 S. E. 160); American Surety Co. *v.* Lake Park School District, 53 Fed. (2d) 178. Moreover, the decision in the Jenal case has seemingly given the court which rendered it no little trouble in the consideration of later cases. State *v.* Hill, 47 Neb. 456 (66 N. W. 541); Bush *v.* Johnson County, 48 Neb. 1 (66 N. W. 1023, 32 L. R. A. 223, 58 Am. St. R. 673); Paxton *v.* State, 59 Neb. 460 (81 N. W. 383, 80 Am. St. R. 689); State *v.* Paxton, 65 Neb. 110 (90 N. W. 983).

It will have been noted, of course, that our conclusion here is not predicated upon such cases as *Smith Roofing Co.* v. *Mitchell,* 117 *Ga.* 772 (45 S. E. 47, 97 Am. St. R. 217); *Pollak* v. *Niall-Herin Co.,* 137 *Ga.* 23 (72 S. E. 415, 35 L. R. A. (N. S.) 13), in which as between private parties it was held, in effect, that where the holder of a check delivers it to the bank upon which it is drawn and is given credit therefor upon the books of the bank, the transaction is equivalent to and will be treated as a payment of the check. The question in the present case concerns the action of public officials with respect to ,public funds, and as against the county (whether so as to others) liability will be determined by the amount of the funds which were lost in the bank. The check may in equity be treated as the equivalent of money, but can be so treated only to the extent that payment in cash could and would have been made thereon, if demanded, and the remainder, if any, is the criterion of liability.

While, as stated above, there is no statute or rule in this State which prohibits a county treasurer from depositing public funds in a bank, it is perfectly manifest that the general rule as to treating a check as payment where the holder is given credit therefor by the drawee bank should not be applied in a case like the present.

The delivery and acceptance of a check in the accounting between the old and the new treasurer, and the crediting of the amount thereof to the account of the payee, were acts which did not bind the county. There is a loss of public funds, and the county is faced with the necessity of fixing the responsibility for this loss. The settlement between the retiring and the succeeding officer was not followed by an exoneration and record as provided by the Civil Code, § 587. We do not now construe this section, but simply note that the effect of the settlement was in any view entirely open so far as the county was concerned. This being an equitable proceeding, the following imaginary investigation will tend to illustrate the equitable rights and liabilities of the parties: The county calls before it the old treasurer and the new treasurer to determine whether a proper accounting has been made by the former to the latter. In this inquiry the fact that a check has passed between them may be utterly ignored. The county says to the old treasurer, Have you paid over to your successor all funds for which you were accountable? The retiring officer replies, I gave him a check for the full amount of the county's money which I had in bank. The county rejoins, This is not a sufficient reply, and asks again, What amount of money did you deliver to your successor? The officer now responds, I paid him no money, but he received such and such an amount upon the check which I delivered to him. The officer is then unquestionably exonerated to this extent, but the inquiry may still proceed for the purpose of determining whether the accounting included anything further which was the equivalent of money, and, if so, in what amount. The answer to these latter questions would involve an investigation as to what additional amount of cash, if any, the bank could and would have paid to the new treasurer in case such payment had been demanded by him. If upon concluding the investigation it appears that there is a difference between the amount which was actually paid and the amount which could have been realized by such demand, the county should look to the new treasurer, and not to his predecessor, for the repairment of this loss.

The foregoing conclusions contemplate a lawful payment by the bank, and are also based upon the assumption that the bank would commit no preference in paying the check or any part thereof, so that the amount paid could be recovered from the party receiving

the same. See, in this connection, *Mobley* v. *King,* 40 *Ga. App.* 451 (150 S. E. 102). The amount of cash which the bank could and would have paid upon the check must be determined as an issue of fact from the proved facts and circumstances, including the financial condition of the bank, as well as the attitude and intention of the officers in charge of the institution, so far as the same may appear from the evidence.

If, as we have held above, the evidence showed at least a partial defense, it necessarily follows that the allegations of the petition, which were not less favorable to the plaintiff, were sufficient to set forth a valid defense. We conclude that the court did not err in overruling the demurrer upon all grounds, or in granting the interlocutory injunction pending trial by a jury upon the issues involved.

*Judgment affirmed. All the Justices concur.*

### ON REHEARING.

BELL, J. 1. A motion for a rehearing, filed by the defendant in error, was granted. It is contended that we should have gone further and held that section 585 is unconstitutional, for reasons stated in the petition. The allegations upon this question are shown in the statement preceding the decision. In the original decision we held that the execution must be construed as having been issued by authority of section 585, and that having been so issued it could not be arrested by affidavit of illegality. This was in accordance with the decision in *Massachusetts Bonding Co.* v. *Richmond County,* 172 *Ga.* 409 (supra). That decision did not rule in terms upon the constitutionality of section 585, nor does the present record require any adjudication upon that specific question. As will be seen on reference to the petition, the attack is made upon the validity of section 1187, and not of section 585. It was the latter section which authorized the issuance of the execution in the manner therein pointed out, and the petition has not drawn into question the constitutionality of that section. Speaking only for himself, the writer will say here what he might have said before, that as an original proposition he would have hesitated to hold that the execution must be construed to have been issued under section 585, or that it could not be arrested by affidavit of illegality. The decision in *Massachusetts Bonding Co.* v. *Richmond County,* supra, seems to be directly in point, however, and, having been rendered by a full bench, must, unless and until it is overruled.

be accepted as authority. It is enough to state that the court is not unanimously in favor of overruling that decision, without noting whether the views of the writer are shared by any of the other Justices.

■ It is further contended that, in reaching the conclusion stated in the second division of the decision as previously filed, we overlooked the case of *Palmer* v. *Harrison*, 165 *Ga.* 842 (142 S. E. 276). The headnote in that case was as follows: "Where a tax-collector, after accepting a taxpayer's check on a Sparta bank and delivering to her a receipt for payment of State and county taxes, held the check for six days and then indorsed and deposited it in a Gibson bank, which indorsed and sent it to an Atlanta bank, which indorsed and sent it to the Sparta bank for collection, which (on the ninth day after its date) charged the amount of it to the drawer's account and later delivered it canceled to her, having also mailed to the Atlanta bank a cashier's or exchange check, which remained unpaid because before its collection the Sparta bank failed and discontinued business, the taxpayer was not subject to execution issued by the tax-collector for the amount of the tax so paid." In the opinion it was said that the collecting bank was the agent of the tax-collector, and that although "taxes are payable in gold and silver, or in the bills of such banks as pay specie promptly" (Civil Code of 1910, § 1013), the effect of the transaction was to pay the taxes in lawful money. We did not overlook the case of *Palmer* v. *Harrison* in the consideration of the present case, but did by inadvertence fail to make reference to it for the purpose of distinguishing it, as we had intended to do. The facts of that case are different from those involved in the case at bar, although by parity of reasoning the decision there might be considered as persuasive in the present case. It is not a precedent, however, and is pertinent only by analogy. We will not extend the ruling there made.

*Judgment adhered to on rehearing. All the Justices concur.*